Feeeman, J.,
delivered the opinion of the Court.
This is a bill filed in the Chancery Court at Greene-ville, to enjoin a suit pending before a Justice of the Peace for Greene county.
The bill alleges that, in 1863 complainant borrowed of the respondent, John Crawford, three hundred dollars in Confederate money, in said county of Greene, and *112 gave his note for the same, and that his impression is that said note calls for either “Confederate money” or “Current bank notes;” that a suit had been commenced on this note sometime after it was given, (before a Justice of the Peace,) and soon after the resumption of the authority of the United States Government in East Tennessee; that the defendant, by means of threats and duress, induced him to give a new note, against his will, payable in current bank notes, in lieu of the first one given; which last note is the one sued on before the Justice of the Peace, the collection of which is sought to be enjoined by this bill.
The bill contains much of mere verbiage and immaterial matter; the above, however, is the substance of its allegations, on which the question is raised on which we rest our decision.
The answer of Crawford admits that the complainant did borrow three hundred dollars from him in 1863, but says he does not remember whether it was in Confederate money or current bank notes, and that complainant gave his note for the same, payable in current bank notes. He admits that about the time General Burnside took possession of East Tennessee, a suit was brought on this note, but denies expressly that on the day set for hearing, or at any other time, he induced complainant by threats or duress, to settle the matter by giving a new note, but states that the giving of the new note was proposed by Naff, freely and voluntarily, and accepted by him as a compromise.
The proof shows clearly that the first note was given for $300 in Confederate money borrowed of Crawford *113 by complainant. It also shows clearly that the note he seeks to enjoin in this case was given in consideration of, or in lieu of, the first note given, and in further consideration that Crawford would dismiss the suit he had commenced before the Justice of the Peace.
It may be that the validity of this note might be sustained on the principles laid down by Parsons on Contracts, vol. I. p. 439: “That the giving up a .suit or any equivalent proceedings instituted to try a question of which the legal result is doubtful, is a good consideration for a promise to pay a sum of money for an abandonment thereof.” But as the question of the validity of a contract, where Confederate notes is its consideration, or the illegality of such contract, in the ordinary transactions of the country, during the late war, within the Confederate States, is fairly presented in this case, we conceive it to be the duty of the Court, to meet the question, and announce what we hold to be the law in such cases. We therefore proceed to the investigation of the question, on principle and authority, and give our conclusions.
The question of Confederate money as the consideration of a contract, was brought before our immediate predecessors, in the case of Wright & Cantrell v. Overall, 2 Cold., 336. In that case, a receipt had been given by Overall for $300, as part payment on a note, and the face of the receipt showed that it was to be entered as a credit on the note sued on in the case.
The Circuit Judge charged the jury that this receipt was an undertaking on the part of Overall, to see that the credit was placed upon the note; “that the undertaking was executory and must be supported by a good *114 or valuable consideration; and that ‘Confederate money/ having been issued against the public policy, and without authority of law, was neither a good or valuable consideration.”
Judge Milligan, in stating the question .to be decided in the case, says, “the whole question turns upon the validity of ‘Confederate money/” and we are not at liberty to evade it. Was the “Confederate States” such a sovereign and independent or political corporation or organization as authorized it to coin money or issue its bonds or notes on the faith and credit of the organization, and bind the people of the “so-called Confederate States fo,r the payment thereof? This is the question with which we have to deal, and however much the business transactions of this State may be involved in it, we have but one duty to perform, and that is to tread the path marked out by the law.”
The learned Judge then goes on to discuss the question, arguing that the “Confederate States were never recognized as a Government by the departments of the Federal Government to which this right of recognition belonged, and that until such recognition of the existence of the new government, the courts could not do so.” He then concludes that the payment, as evidenced by the receipt, having been made in “Confederate money,” was utterly void. The paper itself having been- issued against public policy — for an unlawful and illegal purpose, and without any authority of law, of which the Court can take cognizance — must not be held as worthless bank paper, issued by a legally constituted corporation, but as paper issued without any legal authority whatever, and, *115 therefore, worthless in the payment for property or preexisting debts.” In the case of Thornburg v. Harris, 3 Cold., 158, the same line of argument is presented in the opinion of the Court, by Judge Shackelford, and the question considered- and discussed in an elaborate opinion. The conclusion of the Court is thus stated: “The considération of this note being Confederate Treasury notes, issued in violation of the highest law of the land, and for the purpose of levying war against the Government, is illegal and void.” He then adds: “No Court will lend its aid to enforce a contract which is founded on an immoral or illegal act,” citing numerous authorities in support of this last proposition.
"We have thus given the views of our predecessors, in their own language, on this question, that we may fairly test their soundness, or rather the correctness of their application, on this somewhat interesting, though not now, very practical question; inasmuch as the larger portion of the cases in which it was involved have passed away and been already settled.
It is not questioned that all contracts in violation of morality, and founded on considerations against good morals, are void; that' no agreement to do acts forbidden by the law of God, or which are manifestly in furtherance of immorality, and tend to contaminate the public mind, can be tolerated or can be enforced by the common law. 1 Story on Contr., § 541. In illustration of this rule, Mr. Story says: “So, also, a lease of lodg--ings, for the purposes of prostitution, is void. But the mere fact that the person to whom the board or lodging or any articles are furnished, is a prostitute, does not in *116 validate the contract therefor, unless the very object of the agreement be to pander to her prostitution. Vol. 1, § 542. The same principle, precisely, applies to contracts which violate public policy; that is, that all agreements which contravene the public policy are void, whether they be in violation of law or morals.
The illustrations given of cases in which these principles are applied, or out of which they have grown, are cases of contract in restraint of marriage, marriage brokage contracts, wagers and gaming contracts; contracts to offend against the law and public duty; usury, and trading with an enemy.
We have given this enumeration in connection with •the statement of the rule, in order that we may see clearly what is meant by a contract, immoral, illegal, or in violation of public policy, or founded on an illegal or immoral consideration, and which can not be enforced. We lay down the rule as deduced from these illustrations, to be, that the agreement must be to do or further some illegal or immoral purpose, or some purpose in violation of public policy.
The element that destroys the validity of the agreement is the purpose, by the agreement, to effect or aid the forbidden end, or else the consideration for the promise must have been to do or perform an illegal or immoral act. If this were not the rule, then a contract might be declared void, as against public policy or public law, that did not stipulate for any violation of the one or the other. Take the ease of a contract in restraint of marriage, which is held void. What does such a contract stipulate for? That the one party, for *117 a consideration, agrees that he or she will not marry at all. Marriage being encouraged by the policy of the law, a contract to prevent it is in violation of this policy, and is void.
We need not look further in this direction to ascertain the application and limitations of these well-settled principles. We will, for a moment, look at some of the cases in which the principle has been stated and applied, in the courts of the United States and of our sister States, that we may see whether the loan of Confederate money, or a note given for Confederate money, or a promise to pay Confederate money, within the Confederate lines, during the late war, was in violation of these well-settled principles of law, or whether the cases in 2 and 3 Cold., are not entire misapplications of the principle.
We regret that we have not had access to a larger number of cases on the question, as we feel sure that, on careful examination, they will all be found to sustain the view we have taken. In the ease of Random v. Toby, 11 Howard (U. S.) R., 698, Curtis’ Ed., the notes sued on had been given for African negroes, imported into Texas. It was insisted that the introduction of African negroes, both into the Island of Cuba and State of Texas, was contrary to law, the negroes having been carried from Cuba to that State. The Court said, on this question, that it was not a defense to the notes, either on the ground of want of consideration, or that the contract was in violation of law, and so void. “If,” says the Court, “these notes had been given on a contract to do a thing forbidden by law, undoubtedly they *118 would be void; and the Court would give no remedy to the offending party, though both were in pari delicto. But Toby, (the payee of the notes,) or his agent, McKinney, had no connection with the person who introduced the negroes contrary to law. Neither of the parties in this case had anything to do with the original .contract, nor was their contract in violation of law. The crime committed by those who introduced the ne-groes into the country does not attach to all those who may afterwards purchase them.” And so we say, that, admitting the Treasury notes to have been issued originally in violation of public policy, without any authority of law, still, the wrong of the parties issuing them does not attach to those who may afterwards, without any connection with, or furtherance of the original design, purchase or circulate such notes.
The Court further says, in the above case: “If defendant should be sued for his tailor's bill, and come into Court with the clothes made for him, on his back, and plead that he was not bound to pay for them, because the importer had smuggled the cloth, he would present a case of equal merits, and parallel with the present; but not likely to have the verdict of the jury, or judgment of the Court in his favor.” In another case, goods were sold to a man who intended to smuggle them and defraud the revenue, and the vendor knew of the design — it was held that the contract was valid, and the vendor could recover the price; Holman v. Johnson, Cowp. R.., 341. JBut where goods were sold to a man who intended to smuggle them, and defraud the revenue, and vendor not only knew of the purpose, but put *119 them up in a particular manner, so as to enable it to be done; it was held that the contract was void, and the price could not be recovered; Briggs v. Lawrence, 3 Term. R., 454. “If the illegal use to be made of the goods, say the Supreme Court of Massachusetts, enters into the contract, and forms the motive and inducement, in the mind of the vendor or lender, to the sale or loan, then he can not recover, provided the goods or money are actually used to carry out the design — but bare knowledge on the part of the vendor, that the vendee intends to put the goods or money to an illegal use, will not vitiate the sale or loan, and deprive the vendor of all remedy for the purchase money; Doter v. Earl, 3 Gray, (Mass. R.,) 482. See also, Hedges v. Wallace, 2 Bush., (Ky. R.,) 442; and we add that with much more reason it may be held, that a simple knowledge of the fact that an article was manufactured, or originally designed for an illegal or immoral purpose, will not vitiate or contaminate a subsequent contract for its use, in any way neither illegal or immoral, as in the cases of loan or ordinary use of Confederate money, in the States engaged in the rebellion during the late civil war.
The above cases serve well to present the true principle, that is: there must be a participation in the illegal purpose by the parties to the contract; the agreement must be in aid of, or furtherance of the illegal end.*
If this be the' sound principle, then how can it be held, that the loan by one party, and the borrowing by another, of Confederate treasury notes, was- in any way connected with the original wrong of their issuance, if *120 any there were, or that such loan was intended either to fufther or aid in such issuance, or to aid in the rebellion in which the Confederate States were then engaged. Ve confess we are totally unable to see any wrong, either public or private,' intended by such a transaction; certainly none entered into the minds of the parties at the time, in this case.
We are unable to see how, in fact, the parties in this, and all like cases, can be said to have aided in, or been guilty of, the moral or legal wrong involved in the issuance of these notes, as the wrong had already been done, the purpose attained so far as the notes loaned are concerned, and the amount of such issues was neither increased or diminished by the circulation of the notes, or by the refusal of one party to borrow and the other to loan.
It is insisted, however, that the value of Confederate notes, might have been increased by their circulation, and the parties aided in this circulation by their contract. So it may equally well be said, that the value of the imported negroes ’depended on their importer being able to sell them, and their purchase by parties encourged their importation.
If the argument is sound, that all acts or courses of action, that indirectly tended to aid and strengthen the military power of the Confederate Government were unlawful, and in violation of public policy, whether done with the purpose or intent so to aid and strengthen this military power, or not, then we ask of what offense were such parties guilty, and by what law is their punishment defined? For instance, the growing of corn, and of wheat, the production of meat, the manufacture *121 of clotbs of any kind at borne, and in fact, all tbe energetic industries that were wakened into life during the great civil strife, tended directly to strengthen tbe military power of the Confederate Government, either by supplying its armies with the necessaries thus produced, or by keeping up the heart of the people engaged in- the struggle, by meeting these essential needs, the supply of food and raiment. May we not well suspect the soundness of the argument that involves the proposition, that all the industries of the land, during the late war, without which, millions would have perished, were wrong and-illegal, and in violation of public policy, as tending directly or indirectly to aid the rebellion, whether so intended or not. We need not pursue this branch of .argument further. In support of this view of the question, we refer to the case of Phillips v. Hooker, decided by the Supreme Court of North Carolina; Am. L. Reg., vol. 7, p. 40.
We might cite numerous decisions of several of our sister States, that hold as we have done in this opinion.
We content ourselves, however, with only a few cases, which abundantly sustain the views herein maintained.
The Supreme Court of Kentucky, in the case of Martin v. Horton, et al., 1 Bush., 629, decided in the winter of 1865, Judge Williams delivering the opinion of the Court, ‘that the circulation of ‘ Confederate currency/ within the Federal lines, and jurisdiction of the United States, was forbidden by the laws and public policy of the United States; and also, that the circulation of the United States treasury .notes was likewise *122 forbidden, within the military lines and jurisdiction of the ‘ Confederate States/ as against their public policy and laws.” The Court then goes on to say, the currency that was recognized by the laws and military authorities of ' the Confederate States as money, and its circulation encouraged by its policy, and which did so circulate within its lines and jurisdiction, must be regarded as a valuable and not a vicious or illegal consideration, especially when voluntarily received and used. To permit its reception and use, and then to escape from the obligation, by a party, would be to recognize a system of legalized robbery, which would be equally or more odious to the sensitive justice of the law.” See also, Rhodes v. Patillo, 5 Bush. Ky. R., 272; Miller v. Gould, 38 Georgia R.., cited in Am. L. Reg. for 1869, p. 310.
We need not refer to the late case of Thoringion v. Smith, decided by the Supreme Court of the United States, found in 8 Wallace Rep., p. 1, and reaffirmed and explained by Chief Justice Chase, in the case of Head et als v. Talley, Adm’r, reported in Am. Law Times, Sep. 1870, 157, as holding the views held in this opinion, and maintaining them by what we deem unanswerable reasoning. The Court says, in 8 Wallace, p. 11, and after referring to the character of the Confederate Government and its actual “ supremacy,” as a fact, over its territory during the war; and citing the case of the United States v. Rice, with other cases, too familiar to the profession to be here referred to; that “ it was by this Government exercising its powers throughout an immense territory, that the Confederate *123 notes were issued early in the war, and these notes, in a short time, became almost exclusively the currency of the insurgent States. As contracts in themselves, except in the contingency of successful revolution, those notes were nullities; for except in that event, there could he no payor. They bore, indeed, this character upon their face, for they were made payable only after the ratification of a treaty of peace between the Confederate States and the United States of America. While the war lasted, however, they had a certain contingent value, and were used as money in nearly all' the business transactions of many millions of people. They must be regarded, therefore, as a currency, imposed on the community by irresistible force.”
The Court goes on to say, that, “contracts stipulating for payments, in this currency, can not be regarded, for that reason only, as made in aid of the domestic insurrection.”
“ They have no necessary relations to the hostile Government, whether invading or insurgent. They are transactions in the ordinary course of civil society, and though they may indirectly and remotely promote the ends of the unlawful Government, are without blame, except when proved to have been entered into with actual intent to further invasion or insurrection. We can not doubt that such contracts should be enforced in the Courts of the United States, after' the restoration of peace, to the extent of their just obligations.” This conclusion of that high tribunal, we adopt and approve, and hold that, if a note payable in Confederate money can be actively enforced, as held by the Supreme Court *124 of the United States, that one given in consideration of snch currency loaned, can, with equal, if not greater propriety, be held binding and valid, and enforced in our Courts.
This Court, in the case of Wright and Cantrell v. Overall, 2 Cold., 344 — 345, seem, to rest upon the ground that there was no consideration for the promise of the party sought to be charged, because “Confederate Treasury notes” were not money, and were issued without lawful authority. The case is likened to a payment in counterfeit bills on a bank, which has always been held void, and they cite the principle as follows, from the case of Ware v. Street & Co., 2 Head., 609. “A payment of genuine bank notes, supposed by both parties to be good, though, in fact, worthless, will be binding, and the loss must fall on the receiver, in the absence of a fraud. It is otherwise, if the notes be not genuine; not what they purport to be. So a payment in forged paper would be void, and have no effect as a credit or payment for property, or a pre-existing debt. “Much more,” says the Judge delivering the opinion, in case, in 2 Cold., 345, “must the principle be applicable, when the notes purporting to be money, were issued against public policy, as well as the laws and Constitution of the United States, and expressly for their overthrow.” '
We admit the correctness of the principles cited above from 2 Head, but can not see how it supports the deductions drawn from it by the learned Judge. The Confederate notes were not counterfeits nor forged, but genuine, and precisely what they purported to be, the promi *125 ses to pay, at the time, and on conditions specified on tlieir face, of the Confederate States Government. The party who took them as a loan, took them with the full knowledge what they were; and when he gave his note in consideration of such loan, knew precisely what he had borrowed, and that their future value depended upon the contingency of the result of the war then being waged, and so there was no fraud as to him. It would be more properly likened to the case of a man purchasing a genuine note on a man of doubtful solvency, where the purchaser knew all the facts, and took the chances of realizing the money on it. Certainly no one would contend that he would be exonerated from payment because the party whose note he had purchased proved totally unable to pay it, or even should he die and leave no assets to discharge his liability.
Did these Confederate Treasury notes then furnish that element necessary in every contract — a valuable consideration — at the time when this note was given?
Chief Justice Chase, in Thorington v. Smith, 8 Wall. R., says: “While the war lasted they had a contingent value, and were used as money in nearly all the business transactions of many millions of people.”
By the term consideration, is to be understood some cause which has a legal or appreciable value, and not merely a moral motive: 1 Story on Contr., §§ 427, 228; 429.
The value of an article is either intrinsic, by reason of its use in the affairs of mankind, or extrinsic or exchangeable value, because of the fact that it is an article of exchange, or may, by reason of some circumstance *126 connected with it, be exchanged for other articles of intrinsic value. Gold and silver have both kinds of value, being a medium of exchange, and valuable as such, and also have an intrinsic value by reason of the fact of their usefulness in the manufacture of various articles, such as plate and other wares. It can make no kind of difference as to which kind of- value may be attached to the article furnishing the consideration for a contract, so that it has a real value, either of the one or the other kind.
No one will contend that Confederate Treasury notes did not, during the war, possess an exchangable value; as we all know that almost the entire expenses of a gigantic civil war were met by payments in this currency, for four years; and further, that almost all the money transactions, almost every purchase made by near twelve millions of people for four years, was made by means of these notes — from the purchase by the widow of the medicine for her sick child, or food and raiment for her family, up to the largest transactions that characterize the business of a wealthy, enterprising, intelligent and trading people.
This element of value we hold to have been a .sufficient consideration to support a contract for the loan or payment of Confederate money.
We might add numerous authorities and reasons to what we have cited and said, in support of the conclusions to which we have come in this opinion; but we deem these sufficient.
We have gone at greater length than we desired into the reasons on which this opinion is based, feeling *127 that it was due that we should vindicate our opinion in overruling decisions made by our predecessors, by the weight of well-recognized and well-considered authorities, and show that we have not done this on any mere theories of our own, but in accordance with the adjudication of the highest tribunals, both of the United States and England, and of text writers of established and recognized reputation — such adjudications and text writers as are cited, and deemed authoritative and. conclusive as to what is the law of the land, in deciding all other questions that are presented for settlement in the courts of our country, involving the rights and liberties of the citizen, whether in person or property.
Believing, as we do, that our opinion is based on an overwhelming weight of authority; is in accord with the soundest legal analogies, and supported by the clear dictates of an enlightened reason; works no injustice to any one; will conserve and advance the ends of justice,, and maintain the integrity of contracts, solemnly entered into between man and man while -the opposite view gives the sanction of law to bad faith and dishonesty; we unhesitatingly announce the foregoing conclusions as containing the true rule for the settlement of the question herein discussed.
We hold that the Chancellor erred in his decree for complainant, in this case. We reverse his decree, dissolve the injunction, dismiss the bill; and order that the complainant and his sureties pay the costs in this Court and the Court below.

See Tedder v. Odum, Nashv., 1870.